

EXHIBIT A

LAS VEGAS | AUSTIN | CHICAGO

January 20, 2017

**VIA FIRST CLASS U.S. MAIL**
**AND ELECTRONIC MAIL:**
Steve Stephens
Oklahoma State University
Center for Veterinary Health Sciences
1111 West 17th Street, Office A-427B
Tulsa, Oklahoma   74107
Email: steve.stephens@okstate.edu

      **RE:   Alexandra Guillou**

Dear Mr. Stephens:

    My office represents Alexandra Guillou, a St. Matthews University (SMU) student enrolled in Oklahoma State University (OSU) Center for Veterinary Health Sciences (CVHS) Year IV clinical program.  Ms. Guillou retained us to represent her following a series of incidents with department staff that violated not only the Family Educational Rights and Privacy Act (FERPA) and the Health Insurance Portability and Accountability Act of 1996 (HIPAA) but also her federal civil rights, thereby jeopardizing her professional career, academic standing, and threatening to impermissibly block her graduation entirely.  Ms. Guillou sends this correspondence to assure her progression through the program is not unfairly blocked by CVHS administration, to recoup costs associated with her mistreatment, and to preserve her image and integrity in the face of any additional criticisms by OSU agents.

    Ms. Guillou matriculated to SMU in 2011 and progressed to the clinical component contracted through OSU, SMU's U.S. affiliate school, without any problem.  As an affiliate student, Ms. Guillou became vested with certain rights imparted to all OSU students, pursuant to Guidelines for Year III and IV Students Veterinary Teaching Hospital (Guidelines), as she is "enrolled on a semester by semester basis" and is responsible to "follow campus policies and procedures."  *Guidelines*, at page 5.  However, upon moving to Stillwater, Oklahoma, she encountered medical problems that required more care than local medical staff could provide.  She immediately worked with both SMU and OSU CVHS to secure a documented medical leave of absence from September 15, 2016, through October 16, 2016, so she could receive regular treatment in Oklahoma City.

JASON J. BACH*
ANNE M. LORADITCH**
*Also licensed in Texas and the District of Columbia
**Also licensed in Kentucky

7881 W. CHARLESTON BLVD.
SUITE 165
LAS VEGAS, NEVADA 89117

PHONE (702) 925-8787
FAX (702) 925-8788
WEB WWW.BACHLAWFIRM.COM



Steve Stephens
January 20, 2017
Page 2

Even at this early stage, Ms. Guillou encountered problems, as her medical leave was not processed directly through disability services but was instead facilitated by veterinary faculty, Dr. Dan Burba, and administrative associate, Lucinda Kershaw. As a result, Ms. Guillou was forced to share private medical information directly with the department, which made her uncomfortable. The tone of the required meeting was more adversarial than helpful, and Ms. Guillou felt like it was an interrogation. More frustratingly, Ms. Guillou's liaison at SMU was not properly apprised of her request; rather than conveying her documented medical need, the OSU team told the home school that Ms. Guillou was "having family issues." Nonetheless, with diligent follow-up, Ms. Guillou's leave was approved, and she left to attend to her medical needs.

Halfway through her leave, Ms. Kershaw contacted Ms. Guillou via voicemail reminding her to return her radiology keys. After leaving a brief, polite message, Ms. Kershaw failed to end the call. The resulting, inadvertent recorded message was shocking. An unnamed, unidentified coworker asked, "Aren't you tired of babysitting?" to which Ms. Kershaw replied that Ms. Guillou is "worse than a child," "you'd think she is, like, five years old or something," and that she is "tired of babysitting so much," that Ms. Guillou "doesn't listen, is not responsible, she lied," all to the officemate's laughter. A presumably different coworker then asked, "Well, can't we get rid of her?" to which Ms. Kershaw exuberantly replied, "Yeah, yeah!" Ms. Kershaw then continued to discuss both Ms. Guillou's medical situation and whereabouts for treatment commenting, "Where the hell are you staying there? - well, anyway." Then, to her colleague's amusement, Ms. Kershaw mockingly spoke in a different voice pretending to be Ms. Guillou, ending with her own comment "Do you think that ever happened? NAH!" to group laughter.

Upon listening to the voicemail, Ms. Guillou felt violated, unsafe, and discriminated against because of her need to seek medical treatment. She reached out to OSU associate dean of academic affairs Dr. Margi Gilmour, who tried to dismiss her concerns entirely, claiming that no private information was discussed and, regardless, no one heard the conversation who didn't already know Ms. Guillou's medical situation. In this and immediate subsequent meetings, these OSU administrators repeatedly tried to casually trivialize Ms. Guillou's concerns about Ms. Kershaw's comments, telling her "you are really going to cause a problem for yourself if you decide to do something" and warned "the Veterinary field isn't that big…"

This mishandling provided little relief to the aggrieved student's distress. Ms. Guillou then met with Dr. Tanya Lowery and Dr. Rosalynd Green on October 14, 2016, at the Office of Equal Opportunity (OEO), who verbally agreed the recording was proof that Ms. Kershaw violated FERPA and HIPPA, constituted discrimination against Ms. Guillou based on her medical



Steve Stephens
January 20, 2017
Page 3

condition, and was a threat to kick her out of the program. When Ms. Guillou asked to file a complaint, they said they would look into the process. They plainly told her they were "not familiar with this type of student," referring to the Year IV CVHS program students.

Drs. Lowery and Green followed up by inviting her to meet again along with CVHS Dean Dr. Ross on October 20, 2016. At that meeting, Ms. Guillou again requested to file a complaint against Ms. Kershaw. The team told her that her status as an SMU affiliate student precluded her ability to file a grievance against Ms. Kershaw, notwithstanding the wrongfulness of Ms. Kershaw's actions, and that it had to be handled through personnel. Moreover, though Ms. Kershaw held obvious bias, OSU administration refused to remove Ms. Kershaw from overseeing Ms. Guillou's files, claiming Ms. Kershaw's role was required.

Within a week, Ms. Guillou communicated with someone from SMU about an unrelated billing question; the SMU agent again alluded to Ms. Guillou's "issues" with the OSU clinical program, indicating OSU administration had indeed leached private and inaccurate information yet again. Alarmingly, the character of the situation conveyed was misconstrued and cast Ms. Guillou in a negative light, indicating Ms. Kershaw may very well be making good on her comment that OSU can indeed find a way to get rid of her.

Ms. Guillou is rightfully frustrated with her experience with OSU CVHS administration. Though she has followed proper university procedures and contacted the appropriate agents to convey her concerns with Ms. Kershaw's perceived threats, school officials have met her concerns with apathy and ominous warnings to convince her to ignore signs of inequity or else face bigger problems. The minor remediations they have agreed to provide still involve Ms. Kershaw and the unidentified staff mates' direct involvement. The situation is untenable.

First, it is obvious that Ms. Guillou's integrity and privacy rights are not being respected. Second, Ms. Guillou's program is heavily based upon partial, subjective grading, which a longstanding employee like Ms. Kershaw can easily influence.[1] Finally, Ms. Kershaw's continued involvement in Ms. Guillou's academic career can be devastating; so-called accidental failure to process paperwork or, as has already occurred, conveying misleading or false information

---

[1] Ms. Kershaw was nominated by co-workers in 2004 for the Stratton Staff Award, indicating that even in her administrative role, she likely has tremendous sway with CVHS faculty on both a professional and, given her demonstrated penchant for office chit-chat, on a personal and vindictive level.



Steve Stephens
January 20, 2017
Page 4

to SMU could cause irreparable harm to Ms. Guillou's academic and professional career. For these reasons alone, Ms. Guillou is entitled to relief.

It is uncontested that Ms. Guillou was discriminated against by several members of OSU administration because she sought medical attention. Under the existing legal framework, a college is prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 states: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). Ms. Guillou can assert claims under both of these acts under several theories.

First, discrimination on the basis of disability is prohibited by Title II of the ADA and Section 504. Ms. Guillou can establish a *prima facie* case of a Title II ADA violation by showing "(1) she is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Cohon Ex Rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 724 (10th Cir. 2011) (quoting *Robertson v. Las Animas Cnty. Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007)). Similarly, Ms. Guillou can establish a 504 claim by showing that (1) that she is a 'handicapped individual' under the Act, (2) that she is 'otherwise qualified' for the [benefit] sought, (3) that she was [discriminated against] solely by reason of her handicap, and (4) that the program or activity in question receives federal financial assistance. *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir.1992) (quoting *Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983)). *See Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla.*, 960 F. Supp. 2d 1254, 1266 (N.D. Okla. 2013).

Ms. Guillou has a documented condition, which is also now being monitored by the OSU office for disability services, and the treatment, in the judgment of her doctor, required her leave of absence. *See Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1052 (7th Cir. 1997) (if a medical condition that is not itself disabling nevertheless requires, in the prudent judgment of the



Steve Stephens
January 20, 2017
Page 5

medical profession, treatment that is disabling, then the individual has a disability within the meaning of the Act). Ironically, it was Ms. Guillou's diligent attendance to this medical need that cataclysmically drew Ms. Kershaw's ire. Ms. Guillou is also otherwise qualified for the CVHS Year IV program. A qualified individual for postsecondary education programs "meets the academic and technical standards requisite for admission to, or participation in, the college's education program or activity." *U.S. Department of Education Office for Civil Rights,* "The Civil Rights of Students with Hidden Disabilities Under Section 504 of the Rehabilitation Act of 1973." Neither the voicemail nor prior or subsequent meetings between OSU administration indicated Ms. Guillou's mistreatment was because she didn't live up to CVHS academic or technical standards or that she was not qualified to be in the program. Indeed, Ms. Kershaw never mentioned Ms. Guillou's academic or technical qualifications whatsoever in agreeing that the OSU CVHS department could "get rid of her," only that Ms. Guillou's travel for treatment somehow warranted Ms. Kershaw to threaten to convey, and subsequently did convey, false and misleading information to members of OSU and SMU, thereby jeopardizing Ms. Guillou's future.

It is the discrimination prong of the analysis that is most dispositive and warrants further analysis. The bulk of ADA and Section 504 discrimination jurisprudence stems from a school's failure to properly accommodate a disabled student. In the context of post-secondary education jurisprudence, "'[d]iscrimination' is defined as '[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Hartline v. Nat'l Univ*, 2015 WL 4716491, at *7 (E.D. Cal. 2015). This definition of discrimination is pertinent here, where Ms. Guilliou's claim is not based on the fact that the school failed to accommodate her, but that OSU brazenly singled her out, targeting and threatening her while openly mocking her medical needs. A recent Northern District of Oklahoma decision explained that to demonstrate discrimination a plaintiff must be able to allege facts that support the "conclusion that the defendant took any action, or failed to take action, because of [plaintiff]'s disability." *Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla.*, 960 F. Supp. 2d 1254, 1266 (N.D. Okla. 2013). In *Sutherlin*, the plaintiff's allegations that he was called names correlating to his diagnosis could "reasonably be inferred to make reference to S.S.'s social difficulties," substantiating that the wrongs were *because of* the plaintiff's disability. *Id.*, at 1267.

It is the same case here. In the offensive voicemail, Ms. Kershaw openly mocked Ms. Guillou's need to travel for medical treatment, scornfully joking to officemates simply *because of* Ms. Guillou's condition in direct violation of Ms. Guillou's civil rights. She was singled out. It is highly unlikely Ms. Kershaw and other CVHS officemates spoke disparagingly about all veterinary students and threatened to "get rid" of each one. It is also unlikely that Ms. Kershaw,



Steve Stephens
January 20, 2017
Page 6

the administrative officer tasked with liasioning with affiliate schools, regularly misstates and conveys false information about all affiliate students. If she did, she likely would not have such an important job. In fact, as Dr. Ross noted in a later meeting with Ms. Guillou, there are simply too many students for Ms. Kershaw to target every single one. So, seemingly, Ms. Guillou was targeted directly and exactly *because of* her ADA- and Section 504-sanctioned need to obtain medical leave and for actually taking the qualified, approved leave. This is exactly the kind of discrimination Section 504 and Title II of the ADA are drafted to discourage – direct discrimination on the basis of disability.

In the same vein, Ms. Guillou may also make a claim for disability harassment and hostile education environment. According to the July 25, 2000, Dear Colleague Letter from the Office of Civil Rights in the U.S. Department of Education, *Reminder of Responsibilities under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act*,

> When harassing conduct is sufficiently severe…that it creates a hostile environment, it can violate a student's rights under the Section 504 and Title II regulations. A hostile environment may exist even if there are no tangible effects on the student where the harassment is serious enough to adversely affect the student's ability to participate in or benefit from the educational program.

In the 10th Circuit, a student can claim disability harassment by alleging: "(1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment." *Sutherlin*, at 1267. A student is also not precluded from asserting a hostile education environment claim, which *Sutherlin* noted is "akin to a hostile work environment claim." *Id*. To do so, Ms. Guillou can demonstrate: (1) that she is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on her disability; (4) that the harassment was sufficiently severe or pervasive to create an abusive education environment; and (5) there is a basis for imputing liability to the school. *See Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1196, 1214–15 (D. Kan. 2007); *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007); *Litton v. Maverick Paper Co.*, 388 F.Supp.2d 1261, 1284 (D. Kan. 2005).

The well-documented conflict between Ms. Guillou and the OSU CATV program indicates Ms. Guillou will find success under either, or both, of these theories. Ms. Guillou feels



Steve Stephens
January 20, 2017
Page 7

intimidated and threatened by OSU's CVHS administration. Both she and her family have expressed concerns to OSU administration for her emotional and physical safety after hearing OSU administration talking about "getting rid of her," yet very little has been done to rectify the situation and assuage her concerns. Ms. Guillou undergoes tremendous stress whenever she is required to talk to Ms. Kershaw or other CVHS office administration who were identified on the call, which has been a non-negotiable necessity to her continued enrollment. She is also avoiding the building while out on leave to avoid further, damaging stress. Ms. Guillou's anxiety is justified. While physical harm based on the threat has thankfully not yet materialized, there are indications that Ms. Kershaw or others involved have taken steps to remove Ms. Guillou from OSU; including, but not limited to, providing inaccurate updates concerning Ms. Guillou to her home school, SMU. Dr. Ross has stepped in as Ms. Guillou's direct representative to SMU to attempt to ensure no further character or professional damage occurs, but that effort, while appreciated, is too late. The damage has already been wrought. Moreover, Ms. Guillou should not have to wait until she suffer direct physical harm before her safety concerns are addressed as well.

It is worth noting that to prevail on a claim of hostile work environment theory, Ms. Guillou must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. *Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1196, 1214 (D. Kan. 2007). As *Sutherlin* indicated, the framework for workplace sexual harassment hostile environment is the appropriate way to analyze cases in the disability/education context. *Sutherlin*, at 1267. To establish this claim, therefore, Ms. Guillou must show both that the conduct to which she was subjected was "severe or pervasive enough to create ... an environment that a reasonable person would find hostile or abusive," and that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

The totality of the circumstances indicates the OSU CVHS departmental action has created such a hostile environment here. The administration's laments about Ms. Guillou being a baby or needing babysitting are "humiliating," and certainly the team's hatched plan to "get rid of her" rises to the level of both severe and threatening, especially coupled with the school's negative words against her to SMU's liaison. While Ms. Guillou cannot yet say that Ms. Kershaw and unnamed office staff's threats have interfered with her current performance, as she is out on leave,



Steve Stephens
January 20, 2017
Page 8

she is certain that there will be repercussions in the future. She will refrain from taking classes, at the least, by one of the agents who is thought to be heard in the recording. Moreover, she is concerned for her overall performance assessments, as the associate dean's warning that she is "causing problems for herself" by speaking out here. And, given the rise of actual violence on college campuses, Ms. Guillou still harbors a justified concern that the threat may be to more than her academics. For this, she is entitled to relief.

Ms. Guillou can also assert a corollary retaliation claim against OSU stemming from her treatment. She can sustain a retaliation claim under the ADA and Rehabilitation Act by showing that: (1) she engaged in protected activity; (2) she was subjected to a materially adverse action after the protected activity; and (3) a causal connection existed between the protected activity and the adverse action. *Umholtz v. Kansas, Dep't of Soc. & Rehab. Servs.*, 926 F. Supp. 2d 1222 (D. Kan. 2013); Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990, § 503(a), 42 U.S.C.A. § 12203(a). No one, not OSU's CVHS Dean nor OSO agents, has argued that Ms. Guillou's request for medical leave was improper or otherwise not protected. In fact, OSU officials have admitted that Ms. Guillou's initial leave of absence request was not only justified, but improperly handled by Dr. Barba and Ms. Kerwick.[2] The humiliating and demoralizing voicemail, coupled with the subsequent misleading and damaging statements to SMU, certainly qualifies as materially adverse action.

Because Ms. Guillou's anxiety has been heightened tremendously after being threatened, she has been unable to come back from medical leave and has had to delay her graduation. Moreover, false propagations from OSU to SMU have caused Ms. Guillou further administrative difficulties, including loss of primary health insurance, and have jeopardized her ability to secure alternate clinical sites. SMU has told Ms. Guillou that, as a result, she will not be assigned another location. Finally, there is little question that Ms. Guillou's problems were caused by her attempt to obtain medical leave. Prior to Ms. Guillou reaching out to Dr. Burba and Ms. Kershaw, neither SMU nor OSU provided any record or indication that Ms. Guillou's brief tenure at OSU was "problematic." It was not until *after* Ms. Guillou met with Dr. Burba and Ms. Kershaw to file medical leave paperwork that OSU staff began discussing, defaming, and threatening Ms. Guillou to office staff and to SMU administration. While the office's *reason* for animosity is

---

[2] As both the Dean and OSO agents discussed with Ms. Guillou in their second meeting together, her leave should have been processed directly through OSU's Office of Disability Services, which could have properly protected Ms. Guillou's privacy.



Steve Stephens
January 20, 2017
Page 9

peculiarly within their own knowledge, it is clear that had Ms. Guillou not reached out for help, she would have never been put in Ms. Kershaw's line of fire. For this, she is entitled to relief.

A broader look at OSU's mishandling of Ms. Guillou's academic career proves that her claim is more extensive than disability abuses, however. Throughout its relationship with Ms. Guillou, OSU consistently and capriciously ignored its own stated institutional policies, regulations and contracts set forth governing its relationship with students. Pursuant to OSU Guidelines, Ms. Guillou is an enrolled student on a semester-by-semester basis who is vested with the rights imparted on all OSU students. Oklahoma law specifically recognizes the general theory that "in the United States that the 'basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract.'" *Spencer v. Vatterott Educ. Centers, Inc.*, 2014 WL 1331033, at *1 (2014) quoting *Zumbrun v. University of Southern California*, 101 Cal.Rptr. 499, 504 (1972); *see also Ross v.. Creighton University*, 957 F.2d 410, 416 (7th Cir.1992). OSU specifically forbids discrimination on the basis of disability, stating: It is the policy of Oklahoma State University to provide equal opportunity on the basis of merit without discrimination because of age, race, ethnicity, color, sex, religion, national origin, sexual orientation, veterans' status, or disability." https://eeo.okstate.edu/harassment-and-discrimination

> Oklahoma State University will not tolerate discrimination against any student because of gender, race, age, sexual orientation, status as a veteran, national origin, religion, or disability. Oklahoma State University embraces and commits itself and its faculty and staff employees to follow provisions of state and federal law prohibiting discrimination against persons with disabilities, including, but not limited to, the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973. *OSU Policy 2-0824*.

It is clear from Ms. Guillou's treatment that OSU has completely and utterly failed to meet its own criteria with respect to its well-publicized anti-discrimination policy. For this, she is entitled to relief.

At this point, Ms. Guillou is terrified for her future and is suffering from heightened anxiety, exacerbating an already difficult medical condition. Drs. Lowery, Green and Ross have met with Ms. Guillou since October 2016 to try to mitigate the department's failures and



Steve Stephens
January 20, 2017
Page 10

documented discrimination, but their efforts have regrettably fallen short. Moreover, OSU's recent repeated contacts with Ms. Guillou's mother and Stillwater Police Department to make inquiries have caused Ms. Guillou further anxiety, and such contacts must cease. Ms. Guillou needs relief before she re-enrolls to complete her last steps to a Veterinary degree.

As such, Ms. Guillou has been forced to retain legal counsel to obtain recourse. While Ms. Guillou has retained this office in an attempt to settle this matter without litigation, we will enforce our client's legal rights in a court of law, if required to do so. Accordingly, Ms. Guillou hereby makes the following demands, which are reasonable and necessary in light of the circumstances:

- Ms. Kershaw will not contact Ms. Guillou directly or indirectly. OSU will immediately designate an alternate acting liaison, to be approved by both Ms. Guillou and the Department, to oversee and process Ms. Guillou's work through her graduation from outside the regular OSU CVHS staff;

- OSU will immediately draft a letter clarifying Ms. Guillou's good status to St. Matthews University and revoke any and all negative comments or notations any OSU official made to St. Matthews University. Further, OSU will convey to St. Matthews University that any such negative comments or notations were false and perpetuated by disgruntled staff who have since been disciplined;

- OSU will promise that Ms. Kershaw and other OSU CVHS administration present and party to conversations about "getting rid of" Ms. Guillou will not access Ms. Guillou's files. Such administration will receive written instruction, which Ms. Guillou shall see and approve prior to issuance, and OSU will periodically check the system to ensure their credentials were not used to electronically access or alter Ms. Guillou's files;

- OSU, not just the CVHS department, will recognize a formal complaint issued against all parties involved in the voicemail, not limited to Ms. Kershaw and promise that appropriate sanctions have or will be implemented and permanent notations on the employees' records.



Steve Stephens
January 20, 2017
Page 11

- OSU will work with St. Matthews University to provide any documentation necessary to ensure Ms. Guillou continues to have full access to financial aid, loans, access to student health insurance, and other funding to continue her enrollment;

- OSU will continue to provide Ms. Guillou with access to counseling services at regular intervals to be set by Ms. Guillou;

- OSU and all of its agents will refrain from any negative comments, discussion, or retaliation regarding Ms. Guillou's interactions and related conflicts discussed in this letter;

- OSU will reimburse Ms. Guillou for additional expenses cause by her delay, not limited to rent, living expenses, and medical expenses during the time Ms. Guillou's condition was exacerbated by the CVHS administration misbehavior;

- OSU will reimburse Ms. Guillou for the delay in earning her degree, including lost wages and living expenses of $150,000 for the extra year it will take her to become a veterinarian; and

- OSU will reimburse Ms. Guillou's attorney's fees expended to date in the amount of $4,000.00.

Please respond to this letter within ten (10) days to inform us of your decision. If we do not receive a response, we will assume there is no desire on the part of OSU to resolve this matter amicably, and we will proceed with litigation. We look forward to hearing from you.

Sincerely,

Jason J. Bach

cc: Alexandra Guillou