UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

ALEXANDRA GUILLOU,

        Plaintiff,

v.

BOARD OF REGENTS FOR THE
OKLAHOMA AGRICULTURAL AND
MECHANICAL COLLEGES;
STATE OF OKLAHOMA ex rel.
OKLAHOMA STATE UNIVERSITY;
ST. MATTHEWS UNIVERSITY;
LUCINDA KERSHAW;
DR. DANIEL BURBA;
DR. CHRIS ROSS; and
DR. MARGI GILMOUR;

        Defendants.

Civil Action No.: CIV-17-988-HE

**PLAINTIFF'S RESPONSE IN OPPOSTION TO DEFENDANTS LUCINDA KERSHAW, DR. DANIEL BURBA, DR. CHRIS ROSS AND DR. MARGI GILMOUR'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

COMES NOW Plaintiff, Alexandra Guillou, by and through her undersigned counsel, Jason J. Bach, Esq., of The Bach Law Firm, PLLC, and R. Jack Freeman, respectfully requests that this Court deny Defendants Lucinda Kershaw, Dr. Daniel Burba, Dr. Chris Ross and Dr. Margi Gilmour's (collectively, "Defendants") Motion to Dismiss (the "Motion"). In support of this Opposition, Ms. Guillou respectfully represents as follows:

1

## I.     INTRODUCTION

Ms. Guillou brought an action against Defendants for intentional infliction of emotional distress based their course of harassment and discrimination against her because of her disability. Ms. Guillou was a veterinary student at St. Matthew's University ("SMU") and scheduled to begin her Year IV clinical program in fall 2016 at Oklahoma State University's ("OSU") Center for Veterinary Health Sciences ("CVHS"), an affiliate school of SMU. However, shortly after arriving at the program, Ms. Guillou experienced significant medical problems and sought accommodations, assistance and support through OSU and SMU.

As a result of her medical problems and requests for accommodation, Ms. Guillou was subject to pervasive discrimination and retaliation at the hands of OSU CVSH administration, including Lucinda Kershaw, Daniel Burba, Chris Ross, and Margi Gilmour. She endured targeted hostility, and when she spoke up about the hostility and discrimination, she faced more mistreatment. Ms. Guillou filed suit seeking damages for Defendants' actions. Defendants filed their Motion to Dismiss on December 4, 2017 seeking to dismiss Ms. Guillou's claim. Ms. Guillou now files this opposition in response.

## II.     STANDARD OF REVIEW

Rule 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow

from the facts alleged." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). The plaintiff's facts need only show that there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (To be plausible, a claim must plead factual allegations sufficient to allow "the court to draw a reasonable inference that the defendant is liable for the misconduct" above a "speculative level.").

While "labels and conclusions, or a formulaic recitation of the elements of a cause of action" will not suffice to survive a motion to dismiss, "specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Smith v. U.S.*, 561 F.3d 1090, 1104 (10th Cir. 2009); Fed. R. Civ. P. 8(a)(2) (To withstand a motion to dismiss, however, a complaint must only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

### III.    ARGUMENT AND AUTHORITIES

**A. Ms. Guillou has sufficiently set forth a concerted pattern of discrimination, threats and harassment in the context of an educational setting that, as a whole, plausibly alleges extreme and outrageous conduct**

A claim for intentional infliction of emotional distress requires a showing that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused plaintiff emotional distress; and (4) the emotional distress was severe. *Computer Publications, Inc. v. Welton*, 49, P.3d 732, 735 (Okla. 2002). Defendants, weakly paraphrasing only a few of Plaintiff's allegations, take

3

issue only with whether Ms. Guillou has alleged a plausible claim for extreme and outrageous conduct. However, a proper reading of Plaintiff's allegations and the existing case law in parallel situations makes clear that Plaintiff has sufficiently stated a claim for outrageous conduct and Defendants' Motion should be denied.

    i.    *Defendant's actions*

Ms. Guillou suffers from Attention Deficit Disorder ("ADD"), Post Traumatic Stress Disorder ("PTSD"), severe Depression, and an anxiety disorder which limit her ability to leave the house without debilitating attacks, require her to take medications, and require her to seek extensive medical treatment. Compl. ¶ 72. Defendants each served an oversight role over OSU CVHS and/or SMU students and thus had positions with substantial power and control over Ms. Guillou's ability to remain in her educational program. *Id.* at ¶¶ 4-7.

When Ms. Guillou's disabilities flared, requiring her to take time out from her education, she requested a medical leave. *Id.* at ¶ 18. Had Dr. Burba and Ms. Kershaw directed Ms. Guillou to disability services, as was typical procedure, Ms. Guillou could have obtained the support she needed while maintaining the confidentiality of her mental health conditions and treatment. *Id.* at ¶ 21. Instead, Dr. Burba and Ms. Kershaw's immediate reaction was to interrogate her and force her to share the private details of her medical conditions. *Id.* at ¶¶ 19-20. In that meeting came the first suggestion of concerted effort to threaten to Ms. Guillou's education, that Ms. Kershaw and others ("we") had all spoken with SMU about, one would presume given the context, the problem that Ms. Guillou was. *Id.* at ¶ 20.

Ms. Guillou was ultimately granted leave despite Ms. Kershaw's failure as liaison to properly inform SMU of her meeting with Ms. Guillou and additional efforts on the part of unknown staff within OSU to undermine Ms. Guillou's academic status and standing with SMU by suggesting Ms. Guillou sought not a serious, valid medical leave but rather simply had "family issues." *Id.* at ¶ 22. During that leave, however, Ms. Guillou received a voicemail containing the content of a conversation Ms. Kershaw had with other staff regarding Ms. Guillou's medical conditions and requests. *Id.* at ¶¶ 25-29. That conversation was held in an open and public place, where it was highly likely that it would be overheard and the information would become known to others or Ms. Guillou. *Id.* at ¶ 32. Ms. Kershaw and other OSU staff commiserated about how trying they found Ms. Guillou, belittling her because of her medical situation and need for additional assistance and treatment, accusing her of lying, and then agreeing to "get rid of" her. *Id.* at ¶¶ 25-29.

Worse, when Ms. Guillou attempted to obtain assistance from Dr. Gilmour, in her supervisory and administrative role, to stop efforts of other staff, including Dr. Burba and Ms. Kershaw, to undermine her, attack her because of her disabilities and, at the least, run her out of the program, Dr. Gilmour not only failed to help but launched an attack of her own. *Id.* at ¶¶ 31, 33. Dr. Gilmour reinforced the power that she, Dr. Burba and Ms. Kershaw held over Ms. Guillou and then directly threatened Ms. Guillou that if she were to complain about these events, she would create a problem for herself, not only at OSU or with SMU, but also in the veterinary field as a whole. *Id.* In essence, in exchange for seeking a medical accommodation for significant and severe medical and mental health disabilities, and then for lodging a complaint when she was discriminated against and

5

harassed, Ms. Guillou received a threat that she would be blacklisted in her chosen field if she proceeded any further.

This frighteningly concerted effort to drive Ms. Guillou out of the program, or silence her in her attempt to get the assistance and accommodation she was entitled to, continued when Ms. Guillou again attempted to seek assistance from Dr. Ross and he told her that she could not file a complaint about Ms. Kershaw. *Id.* at ¶ 38. Dr. Ross further refused to remove Ms. Kershaw from overseeing Ms. Guillou's files, thus ensuring that the person who had discriminated against, harassed and threatened her would continue to hold the same level of power and authority over her. *Id.* at ¶ 38.

Indeed, Ms. Kershaw took the opportunity to undermine Ms. Guillou again by communicating fabricated information about the events of the fall to SMU such that it jeopardized Ms. Guillou's academic status. *Id.* at ¶¶ 41-42. Nonetheless, Dr. Ross continued to refuse to remove Ms. Kershaw from her position over Ms. Guillou or otherwise take action as a result of her actions, and continued to refuse to permit Ms. Guillou to file a complaint. *Id.* at ¶ 44. This disturbing campaign reached its climax when Dr. Ross harnessed the power of the police to threaten and harass Ms. Guillou, using false information to send them to her home, knowing that she had substantial anxiety and other medical conditions.[1]  *Id.* at ¶¶ 49, 118.

---

[1] A welfare check call is not the benign event OSU would like us to believe. This Court may take judicial notice of the fact that news reports regarding the danger in police interactions have been published or the fact that in recent years the public consciousness of the risk of harm attendant in even every day police encounters has been raised, impacting the effect a false report to police would have on Ms. Guillou as a threatening retaliatory action. *See* Fed. R. Evid. 201(b) (A judicially noticed fact is "one not subject

## ii. Defendant's actions constituted extreme and outrageous conduct

What conduct may be considered extreme and outrageous is not determined in a vacuum. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) ("The outrageous and extreme nature of the conduct to be examined should not be considered in a sterile setting, detached from the milieu in which it took place. The salon of Madame Pompadour is not to be likened to the rough-and-tumble atmosphere of the American oil refinery."). Under Oklahoma law, the totality of the circumstances and context it to be considered. *See Chellen v. John Pickle Co., Inc.*, 446 F. Supp.2d 1247, 1276 (N.D. Okla. 2006). In some circumstances, "conduct may be characterized as extreme and outrageous in part due to the alleged tortfeasor's abuse of a position of actual or apparent authority over the injured

---

to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") News reports of victims harmed, and often killed, at the hands of police as a result of false reports are unfortunately common. *See Foley v. Univ. of Dayton*, 81 N.E.3d 398, 404 (Ohio 2016) (O'Neill, J., dissenting) ("The news regularly reports on those who are injured or killed during the police response to inaccurate or false reports of crime") (listing recent examples in Ohio and additionally noting property damage resulting from such checks). The risk of harm is not limited to false reports of crimes or potential crimes – there have been multiple reports of deaths and injuries resulting from the same "welfare check" called in by OSU here. *See, e.g., Officer and K-9 injured, suspect dead after shooting in Pinetop*, 12 News (Oct. 9, 2017), available at http://www.12news.com/news/local/arizona/officer-and-k-9-injured-suspect-dead-after-shooting-in-pinetop/481932845 (accessed Jan. 8, 2018) (subject of welfare check killed, officer shot); Allen, *Police Fatally Shoot Perryopolis Man During Welfare Check*, CBS Pittsburgh (Oct. 7, 2017), available at http://pittsburgh.cbslocal.com/2017/10/07/welfare-check-police-shooting/ (accessed January 8, 2018); Holley, *Police Performing Welfare Check on Elderly Army Veteran End Up Killing Him Instead*, The Washington Pot (Feb. 9, 2015), available at https://www.washingtonpost.com/news/morning-mix/wp/2015/02/09/police-performing-welfare-check-on-elderly-army-veteran-end-up-killing-him-instead/?utm_term=.ce0e31881b8f (accessed Jan. 8 2018).

party." *Daemi v. Church's Fried Chicken, Inc*, 931 F.2d 1379, 1388 (10th Cir. 1991) (applying Oklahoma law).

A consideration of the totality of the circumstances and the context in which these actions occurred – a professional education program at an esteemed state university – makes clear that Ms. Guillou has alleged facts that, when taken as true and with all reasonable inferences drawn in her favor, raise a plausible claim for relief. *See Iqbal*, 556 U.S. at 678. Ms. Guillou has alleged that those in a position of power and controlling her educational and future professional life, in a context in which the public would not expect concerted campaigns of harassment and discrimination to occur, abused that power by threatening her because of her disability and her efforts to seek accommodations. *See Breeden v. League Svcs. Corp.*, 575 P.2d 1374, 1377 (Okla. 1978) ("The outrageous or extreme character of conduct required may arise from an abuse of a position or a relationship which gives the actor actual or apparent authority over another or the power to affect another's interest.").

Both the environment in which the actions happen and the characteristics of the victim are part of the consideration of the totality of the circumstances. Outrageous conduct has been found where the defendant knew the victim had particular fears or challenges, and acted in a manner that exacerbated those fears and challenges. *Gerks v. Deathe,* 832 F. Supp. 1450, 1454 (W.D. Okla. 1993) (denying summary judgment where teacher locked student with a disability alone in a bathroom for two hours, noting that the student had a documented fear of being left alone in a bathroom).

Outrageous conduct has also been found where harassment occurs in the context of a university setting. In *Dashan v. Oklahoma, ex rel. Bd. of Regents of Univ. of Okla.*, No. 08-CV-186-TCK-FHM, 2008 WL 4899240, at *11 (N.D. Okla. 2008) the plaintiff, a faculty member at a medical university, alleged that "[d]efendants engaged in an ongoing pattern of behavior designed to force him to resign his position and that [d]efendants did so, at least in part, based on his Muslim religion and/or his Egyptian nationality." Noting that a medical university "is not an atmosphere in which one typically expects to endure a certain degree of harassment or horseplay," the court found that the allegations of religious and ethnically charged statements coupled with deliberate attempts to force the plaintiff out of his faculty position were sufficient to state a claim for IIED. *Id.*

Further, discrimination and harassment based on protected characteristics has been noted to be extreme and outrageous conduct sufficient to support an IIED claim across settings. See *Dashan,* 2008 WL 4899240, at *11 (harassment based on an employee's Muslim religion and/or Egyptian nationality); *Chellen*, 446 F. Supp.2d at 1276 (name calling, profanity, threats, and harassment based in part on national origin, combined with the actor's control over the plaintiffs' living and working conditions was outrageous); *Lasley v. Hershey Foods Corp.,* 35 F. Supp. 2d 1319, 1323-24 (D. Kan. 1999) (allegations of racially hostile work environment, including a racist poster, written racial slurs, and use of racial slurs by management sufficient to allege IIED); *see also Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1381 (10th Cir. 1991) (noting potential for outrageous conduct where supervisor made derogatory comments to employee based on race and

national origin and threatened him with termination if he did not eliminate subordinates of a particular national origin).

Finally, allegations of retaliation for complaints as well as group efforts to drive a plaintiff out of an employer, similar to the ones alleged here, have also been found sufficient to withstand a motion to dismiss an IIED claim. *See Murphy v. Spring*, Case No. 13-CV-96-TCK-PJC, 2013 WL 5172951, *3 (N.D. Okla. Sep. 12, 2013) (allegations that a secretary was demoted and terminated because she reported her supervisor's endangerment of students and misappropriation of funds, along with access of private email by supervisor, was sufficient to survive motion to dismiss); *Kisselburg v. AR Allen Group, Inc.*, No. 05-0715-F, 2005 WL 2897431, at *4 (W.D. Okla. Nov. 1, 2005) (denying motion to dismiss IIED claim where plaintiff was terminated after reporting safety and health risks related to the repair of an aircraft); *Joffe v. Vaughn*, 873 P.2d 299, 303 (Okla. App. 1993) (denying summary judgment where defendant and management worked to drive newscaster out of agency by discrediting newscaster and spreading false rumor of homosexual activity, resulting in newscaster's termination).

Ms. Guillou clearly sets forth sufficient allegations the Defendants' conduct was extreme and outrageous and Defendants' Motion should be denied.

### IV.     REQUEST FOR LEAVE TO AMEND THE COMPLAINT SHOULD THE COURT BE INCLINED TO GRANT ANY PORTION OF THE MOTION

In the event this Court is inclined to grant any portion of the Motion, Ms. Guillou requests leave to amend her Complaint. Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Pro. 15(a). This presumption in favor of leave to amend aligns

with the Rule's underlying purpose of advancing decisions on the merits, rather than pleadings or technicalities. *See Conley v. Gibson*, 355 U.S. 41, 48 (1957). Thus, leave to amend should not be denied in the absence of substantial reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010). In the event this Court finds Ms. Guillou's caus of action insufficient, leave to amend is respectfully requested.

## V. CONCLUSION

For the reasons stated above, Ms. Guillou requests that this Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

**THE BACH LAW FIRM, LLC**

*/s/ Jason J. Bach*
Jason J. Bach, Esq.
(Admitted Pro Hac Vice)
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
and

**GRAHAM &FREEMAN, PLLC**
R. Jack Freeman, OBA #3128
6226 East 101st Street, Suite 300
Tulsa, Oklahoma 74137-7117
Telephone: (918) 298-1716
Facsimile: (918) 298-1728
Email: jfreeman@grahamfreeman.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2017, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Clinton W. Pratt
Clint.pratt@okstate.edu

Stephen R. Stephens
Steve.stephens@okstate.edu

Courtney K. Warmington
cwarmington@fullertubb.com

J. Jeremy Tub
Jeremy.tubb@fullertubb.com

Tiffany J. Wythe
Tiffany.wythe@fullertubb.com

Kimberly F. Williams
kwilliams@locklord.com

Sean W. Kilian
skilian@locklord.com

Margaret McCorrow-Love
mml@lovelawfirm.legal

John L. Love
jjl@lovelawfirm.legal

*/s/ Jason J. Bach*
Jason J. Bach, Esq.