**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

ALEXANDRA GUILLOU,

Plaintiff,

v.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES;
STATE OF OKLAHOMA ex rel. OKLAHOMA STATE UNIVERSITY;
ST. MATTHEWS UNIVERSITY;
LUCINDA KERSHAW;
DR. DANIEL BURBA;
DR. CHRIS ROSS; and
DR. MARGI GILMOUR;

Defendants.

Civil Action No.: CIV-17-988-HE

**PLAINTIFF'S RESPONSE IN OPPOSTION TO DEFENDANTS BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES AND THE STATE OF OKLAHOMA EX REL. OKLAHOMA STATE UNIVERSITY'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

COMES NOW Plaintiff, Alexandra Guillou, by and through her undersigned counsel, Jason J. Bach, Esq., of The Bach Law Firm, PLLC, and R. Jack Freeman, respectfully requests that this Court deny Defendants Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and the State of Oklahoma ex rel. Oklahoma State University's (collectively, "OSU" or "Defendants") Motion to Dismiss (the "Motion"). In support of this Opposition,[1] Ms. Guillou respectfully represents as follows:

[1] For the avoidance of the doubt, this response is in opposition to the motions to dismiss filed at Docket Nos. 32 and 33, which appear to be identical.

## I. INTRODUCTION

Ms. Guillou brought an action against Defendants seeking damages and injunctive relief to remedy violations of her rights secured by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") and for breach of contract and the covenant of good faith and fair dealing. Ms. Guillou was a veterinary student at St. Matthew's University ("SMU") and scheduled to begin her Year IV clinical program in fall 2016 at OSU's Center for Veterinary Health Sciences ("CVHS"), an affiliate school of SMU. However, shortly after arriving at the program, Ms. Guillou experienced significant medical problems and sought accommodations, assistance and support through OSU and SMU.

As a result of her medical problems and requests for accommodation, Ms. Guillou was subject to pervasive discrimination and retaliation at the hands of OSU CVSH administration, including Lucinda Kershaw, Daniel Burba, Chris Ross, and Margi Gilmour. She endured targeted hostility, and when she spoke up about the hostility and discrimination, she faced more mistreatment. Ms. Guillou filed suit seeking injunctive relief and damages for Defendants' actions. Defendants filed their Motion to Dismiss on December 4, 2017 seeking to dismiss Ms. Guillou's ADA and Section 504 claims. Ms. Guillou now files this opposition in response.

## II. STANDARD OF REVIEW

Rule 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007). "This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). The plaintiff's facts need only show that there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (To be plausible, a claim must plead factual allegations sufficient to allow "the court to draw a reasonable inference that the defendant is liable for the misconduct" above a "speculative level.").

While "labels and conclusions, or a formulaic recitation of the elements of a cause of action" will not suffice to survive a motion to dismiss, "specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Smith v. U.S.*, 561 F.3d 1090, 1104 (10th Cir. 2009); Fed. R. Civ. P. 8(a)(2) (To withstand a motion to dismiss, however, a complaint must only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

## III. ARGUMENT AND AUTHORITIES

### A. Ms. Guillou sets forth numerous acts carrying a risk of humiliation and damage to her reputation, educational opportunities and employment and career prospects that constitute adverse actions taken because of her protected activity

To set forth a prima facie case of retaliation under the ADA and Section 504, Ms. Guillou must only show that 1) she engaged in protected activity, 2) she was subject to

adverse action and 3) there was a causal connection between the protected activity and the adverse action. *Reinhardt v. Albuquerque Pub. Bd.*, 595 F.3d 1126, 1131 (10th Cir. 2010). Defendants appear to challenge only the sufficiency of Ms. Guillou's allegations of adverse action.

An adverse action is one which, given the circumstances, might have dissuaded a reasonable person from continuing to engage in the protected activity. *Reinhardt v. Albuquerque Pub. Bd.*, 595 F.3d 1126, 1133 (10th Cir. 2010). However, though the adverse action must be material, courts in this circuit construe the phrase liberally and "[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions." *Id.* (internal citations and quotations omitted). In all cases, the inquiry is a case-by-case one, focusing on the specific facts and circumstances of the case at hand. *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006).

The confines of constitutes an "adverse action" are more fully defined in case law in the employment context than in the higher education context, nonetheless the basic standard remains the same across contexts. *See Jeffries v. State of Kansas*, 147 F.3d 1220, 1232-33 (10th Cir. 1998). Further, given that Ms. Guillou was enrolled in SMU and at OSU to pursue a veterinary degree, a professional degree leading directly to particular and exclusive employment and career opportunities, a number of examples of adverse action in the employment context are particularly instructive here. In *Reinhardt*, for example, the Tenth Circuit held that actions reducing a teacher's workload such that a reasonable teacher would fear for her job constituted an adverse action. The court in *Reinhardt* also

found the filing of a police report to be a materially adverse action because of the damage it could cause to the teacher's reputation and her future employment prospects. Similarly, written warnings may be an adverse action in the employment context when it is shown that additional warnings increase the risk of termination. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006). Though the warning itself did not result in termination, the increased risk of termination resulting from the warning was sufficient. *Id.*

Ms. Guillou's request for medical leave, rather than being directed through the typical channels of Student Disability Services, was handled through OSU CVHS by Dr. Burba and Ms. Kershaw. Compl. ¶19. As a consequence, Ms. Guillou was unnecessarily subject to an interrogation and forced to disclose private medical information.[2] *Id.* ¶20. Dr. Burba and Ms. Kershaw then spoke with SMU, the institution that would ultimately be granting Ms. Guillou her degree and thus retained substantial control over her, telling them not that Ms. Guillou sought a valid medical leave but that she was neglecting her studies because of family issues. *Id.* ¶20-22. This communication not only prevented SMU from timely addressing her clear disability related need, but also clearly served as an attempt to undermine her with SMU by suggesting a perhaps frivolous basis for her absence. *Id.*

---

[2] Though Defendants attempt to argue that such procedures were necessary for any university, at the motion to dismiss stage, Plaintiff's allegations must be taken as true. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010). Further, any argument by a defendant regarding the non-discriminatory or non-retaliatory nature of an adverse action delves into the evidentiary standard for retaliation claims and thus goes beyond what may be considered at this stage. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002) ("The prima facie case [of discrimination]…is an evidentiary standard, not a pleading requirement").

These and the other negative communications increased the risk that SMU would believe that she had abandoned her studies, sought leave for an unapproved reason, or was otherwise failing to fulfill her obligations as a student and thus put her degree, and resulting employment prospects in the field, in jeopardy. *See Reinhardt v. Albuquerque Pub. Bd.*, 595 F.3d 1126, 1133-34 (10th Cir. 2010) (action may be adverse where it could damage reputation or employment prospects); *Annett v. University of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004) ("[A]n action that significantly harms a plaintiff's future employment prospects may be considered an adverse action."). Similarly, the threats to get rid of Ms. Guillou – at the very least a clear intent to run Ms. Guillou of the program, and at worst a far more sinister statement – and the warnings about pursuing her complaint, with the clear implication that by doing so she was jeopardizing her status in the program and in her future field, were clearly adverse action. *Id.*; *Jeffries v. State of Kansas*, 147 F.3d 1220, 1232-33 (10th Cir. 1998) (finding adverse action where threats came from those with influence over educational opportunities and threatened actions could have a significant impact on future educational and employment opportunities).

Such threats, made by administrators in the program Ms. Guillou was required to complete for graduation and who clearly had a substantial role in overseeing her performance and communicating with SMU, would reasonably produce a fear of dismissal from the program and the ruining of her career aspects. *See id.* That reasonable fear was realized when Ms. Guillou spoke with SMU regarding an unrelated matter and learned that OSU's comments had jeopardized her academic status. Compl. ¶40. Ms. Kershaw also publicly disparaged Ms. Guillou, shared her confidential information and accused her of

lying, all of which, given Ms. Kershaw's position, carry a significant risk of humiliation, damage to Ms. Guillou's reputation, and a concomitant harm to her educational and employment prospects. *See Reinhardt v. Albuquerque Pub. Bd.*, 595 F.3d 1126, 1133 (10th Cir. 2010). Indeed, according to Dr. Gilmour's statements regarding the size of the veterinary field – and the implication that blacklisting her or ruining her future career would be relatively easy – it is clear that any one of the involved OSU staff had the potential power to damage her future employment prospects. *See* Compl. ¶33.

Finally, OSU called Ms. Guillou's mother under the pretense of "checking up" on her and, despite being told she was well, persisted in harassing her by calling the police and falsely reporting that Ms. Guillou's family was concerned.[3] *Id.* at ¶¶48-49. As a result, the police showed up at her residence, demanding access and invading her home, causing trauma and exacerbating her condition. *Id.* at ¶¶49-50. OSU's actions also threatened her housing when the residential management company, apparently reacting to the police visit, began random apartment checks and treating Ms. Guillou with suspicion. *Id.* at ¶51.

---

[3] In response to Ms. Guillou's allegations, Defendants have attached a demand letter from Ms. Guillou's counsel to their Motion; the letter was sent for settlement purposes only and is thus inadmissible under Fed. R. Evid. 408. Defendants also attempt to introduce facts outside the pleadings, although without support, by arguing a non-discriminatory reason for OSU's adverse action and disputing Ms. Guillou's allegations regarding the timing and sequence of events, none of which is permitted on a motion to dismiss. *See supra* n.1. What is relevant here is that Ms. Guillou has sufficiently alleged factual allegations to set forth a claim for retaliation under the ADA and Rehabilitation Act. *See Iqbal*, 556 U.S. at 678. Additionally, in doing so, she had specifically pled facts that undermine the alternative explanation advanced by Defendants, including that the call to police was, bizarrely, made by someone in OSU's legal office – the office that received Ms. Guillou's attorney's communication – and made despite the fact that Ms. Guillou's mother informed OSU that she was just fine. Compl. ¶ 48.

Defendants attempt to minimize the seriousness of this action, but the significance of a state university harnessing the power of the police to retaliate against and harass a student because she asked for accommodations cannot be understated – the harm to Ms. Guillou's education, reputation and employment prospects that might be perpetuated by Defendants pales in comparison to the risk of physical harm, in additional to psychological and economic harm, Ms. Guillou faced as the subject of a false police report.[4]

The adverse actions that Ms. Guillou suffered because of her request for

---

[4] A welfare check call is not the benign event OSU would like us to believe. This Court may take judicial notice of the fact that news reports regarding the danger in police interactions have been published or the fact that in recent years the public consciousness of the risk of harm attendant in even every day police encounters has been raised, impacting the effect a false report to police would have on Ms. Guillou as a threatening retaliatory action. *See* Fed. R. Evid. 201(b) (A judicially noticed fact is "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") News reports of victims harmed, and often killed, at the hands of police as a result of false reports are unfortunately common. *See Foley v. Univ. of Dayton*, 81 N.E.3d 398, 404 (Ohio 2016) (O'Neill, J., dissenting) ("The news regularly reports on those who are injured or killed during the police response to inaccurate or false reports of crime") (listing recent examples in Ohio and additionally noting property damage resulting from such checks). The risk of harm is not limited to false reports of crimes or potential crimes – there have been multiple reports of deaths and injuries resulting from the same "welfare check" called in by OSU here. *See, e.g., Officer and K-9 injured, suspect dead after shooting in Pinetop*, 12 News (Oct. 9, 2017), available at http://www.12news.com/news/local/arizona/officer-and-k-9-injured-suspect-dead-after-shooting-in-pinetop/481932845 (accessed Jan. 8, 2018) (subject of welfare check killed, officer shot); Allen, *Police Fatally Shoot Perryopolis Man During Welfare Check*, CBS Pittsburgh (Oct. 7, 2017), available at http://pittsburgh.cbslocal.com/2017/10/07/welfare-check-police-shooting/ (accessed January 8, 2018); Holley, *Police Performing Welfare Check on Elderly Army Veteran End Up Killing Him Instead*, The Washington Pot (Feb. 9, 2015), available at https://www.washingtonpost.com/news/morning-mix/wp/2015/02/09/police-performing-welfare-check-on-elderly-army-veteran-end-up-killing-him-instead/?utm_term=.ce0e31881b8f (accessed Jan. 8 2018).

accommodation and her complaint regarding Ms. Kershaw's remarks would clearly have dissuaded a reasonable student from pursuing any further complaint. They did, in fact, not only dissuade Ms. Guillou from filing further complaints but also included actions impeding her attempts to do so. Compl. ¶44 ("They also still refused to allow Ms. Guillou to file a complaint."); *see Smith v. Cal. Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1180-81 (N.D. Cal. 2014) (failure of an employer's equal employment office to provide appropriate complaint forms to an employee complaining of discriminatory action could dissuade reasonable employees from complaining through the internal office). Defendant's contention that, somehow, Ms. Guillou's filing of the instant claim alone shows she was not dissuaded is nonsensical – if that were true, a court would never find averse actions, as a plaintiff's very act of filing a lawsuit would immediately defeat any such claims.

**B. Ms. Guillou sufficiently alleges differential treatment and the denial of equal opportunity to enjoy the benefits, services and other aspects of OSU's program that rise to the level of intentional discrimination**

Ms. Guillou can establish a prima facie case of a Title II ADA violation by showing "(1) she is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Cohon Ex Rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 724 (10th Cir. 2011) (quoting *Robertson v. Las Animas Cnty. Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007)). A discrimination claim under Section 504 requires the additional showing that the program or activity in question receives federal financial assistance. *Johnson by Johnson v.*

*Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992).

The Tenth Circuit follows the majority of circuits in holding that a showing of intentional discrimination is not required to establish liability for disability discrimination, but only to obtain compensatory damages. *Powers v. MJB Acquisition Corp,* 184 F.3d 1147, 1153 (10th Cir. 1999). To prevail on an intentional discrimination claim, a plaintiff must show defendant (1) had "knowledge that a harm to a federally protected right is substantially likely," and (2) "fail[ed] to act upon that . . . likelihood." *Barber Ex Rel. v. Colorado Dept. of Rev*, 562 F.3d 1222, 1229 (10th Cir. 2009) (internal quotations and citations omitted). A "failure to act [is] a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.* However, deliberate indifference does not require a showing of "personal ill will or animosity toward the defendant." *Id.* at 1228.

As an initial matter, that Defendants read the anti-discrimination prohibitions of the ADA and Section 504 far too narrowly is clear from the statutes and their implementing regulations. "Congress sought with § 504 — and consequently with Title II of the ADA — to remedy a broad, comprehensive concept of discrimination against individuals with disabilities...." *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 859-60 (10th Cir. 2003). "Title II essentially simply extends the anti-discrimination prohibition embodied in section 504 of the Rehabilitation Act, which prohibits discrimination against the disabled by recipients of federal funding to *all* actions of state and local governments." *Chaffin v. Kansas State Fair Bd*, 348 F.3d 850, 858-59 (10th Cir. 2003) (also noting it was noteworthy that "Congress intentionally chose not to list all the types of actions that are included within

the term 'discrimination' [under Title II], as was done in titles I and III") (internal quotation and citation omitted) (emphasis in original).

Under 28 C.F.R. § 35.130(b)(1), discrimination under Title II of the ADA encompasses actions that:

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; …
>
> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

Ms. Guillou has alleged that, because of her disability, she was deprived of the opportunity to file a discrimination complaint. Compl. ¶¶ 36, 38, 44. She failed to receive the same level of advising and program support, including compliance with confidentiality and student records privacy laws and policies. Compl ¶¶ 21-22, 28, 33, 44, 73. She was subjected to harassment and ridicule in and by the program that differed from that directed at non-disabled students. Compl. ¶¶ 20, 28-29, 73. She was ultimately denied access to OSU's computer system. Compl. ¶ 47. In the words of OSU administrators, she "didn't get the resources [she] needed up front." Compl. ¶39.

These actions clearly provide something less effective than, not equal to or otherwise limit Ms. Guillou in her enjoyment of the benefits, rights, privileges, advantages or opportunities attendance in *all* of the programs and services provided by OSU. *See*

*Jeffries v. State of Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998) (finding where student was repeatedly subject to threats regarding her future in an academic program, "she was obviously deprived of the educational benefit she contracted to receive with all of the attendant consequences."). As Defendants acknowledge, the academic advising, support, administrative management, communication with SMU, management of medical leaves and accommodation requests, and monitoring of student progress are all "necessary" aspects in some manner (albeit not in the manner Defendants carried them out) of the OSU program and thus clearly fall under the ambit of the benefits, services, programs, privileges or opportunities reached by the ADA and Section 504. *See id.*; Motion at 4, 12; 28 C.F.R. § 35.130(b)(1).

That some of the allegations outlined in Ms. Guillou's complaint give rise to both claims of retaliation and other claims of intentional discrimination is neither relevant nor unusual. The reason that retaliation, prohibited in a distinct section of the acts, is essentially a form of intentional discrimination is that it is a form of "differential treatment," which is the very definition of discrimination. *Jackson v. Birmingham Bd.*, 544 U.S. 167, 174 (U.S. 2005). Here, defendants made their animus and its connection to Ms. Guillou's disability quite clear through comments regarding her need for medical treatment and threats regarding her complaints, and even OSU's Office of Equal Opportunity agreed Ms. Guillou had been subject to clear discrimination. Compl. ¶¶ 26-31, 33, 35; *see Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla.*, 960 F. Supp. 2d 1254, 1266-67 (N.D. Okla. 2013) (plaintiff's allegations that he was called names correlating to his diagnosis could "reasonably be inferred to make reference to S.S.'s social difficulties," substantiating that

the wrongs were because of the plaintiff's disability).

Further, Ms. Guillou undeniably sets forth allegations raising a plausible claim of differential treatment, and thus discrimination, on the basis of her disability and an action on the basis of Ms. Guillou's disability can be nothing less than intentional. *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1415 (10th Cir. 1997). This is particularly true "[w]here, as here, a plaintiff does not bring an action until after [she] has asked a public entity to comply with its statutory obligations and the entity has refused." *Id*. In such cases, "there can be no question as to what the defendant's obligation under the statute is and no question that the [defendant] was aware of that obligation." *Id.* (internal quotations omitted). Ms. Guillou more than meets the requirement of setting forth allegations from which the Court can determine that, taking the allegations as true and drawing all reasonable inferences in her favor, Defendants discriminated against her in violation of the ADA and Section 504. *See Iqbal*, 556 U.S. at 678.

## IV. REQUEST FOR LEAVE TO AMEND THE COMPLAINT SHOULD THE COURT BE INCLINED TO GRANT ANY PORTION OF THE MOTION

In the event this Court is inclined to grant any portion of the Motion, Ms. Guillou requests leave to amend her Complaint. Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Pro. 15(a). This presumption in favor of leave to amend aligns with the Rule's underlying purpose of advancing decisions on the merits, rather than pleadings or technicalities. *See Conley v. Gibson*, 355 U.S. 41, 48 (1957). Thus, leave to amend should not be denied in the absence of substantial reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010). In the event this Court finds any of Ms. Guillou's causes of action insufficient, leave to amend is respectfully requested.

## V. CONCLUSION

For the reasons stated above, Ms. Guillou requests that this Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

**THE BACH LAW FIRM, LLC**

*/s/ Jason J. Bach*

Jason J. Bach, Esq.
(Admitted Pro Hac Vice)
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
and

**GRAHAM &FREEMAN, PLLC**
R. Jack Freeman, OBA #3128
6226 East 101st Street, Suite 300
Tulsa, Oklahoma 74137-7117
Telephone: (918) 298-1716
Facsimile: (918) 298-1728
Email: jfreeman@grahamfreeman.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2017, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Clinton W. Pratt
Clint.pratt@okstate.edu

Stephen R. Stephens
Steve.stephens@okstate.edu

Courtney K. Warmington
cwarmington@fullertubb.com

J. Jeremy Tub
Jeremy.tubb@fullertubb.com

Tiffany J. Wythe
Tiffany.wythe@fullertubb.com

Kimberly F. Williams
kwilliams@locklord.com

Sean W. Kilian
skilian@locklord.com

Margaret McCorrow-Love
mml@lovelawfirm.legal

John L. Love
jjl@lovelawfirm.legal

*/s/ Jason J. Bach*
Jason J. Bach, Esq.