## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ALEXANDRA GUILLOU, | |
| Plaintiff, | No. CIV-17-988-HE |
| v. | |
| BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; STATE OF OKLAHOMA ex rel. OKLAHOMA STATE UNIVERSITY; and ST. MATTHEWS UNIVERSITY, | **FIRST AMENDED COMPLAINT[1]**<br>**(Jury Demanded)** |
| Defendants. | |

COMES NOW, Plaintiff ALEXANDRA GUILLOU ("Plaintiff" or "Ms. Guillou"), by and through her undersigned attorneys, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

### INTRODUCTION

Ms. Guillou seeks damages and injunctive relief to remedy violations of her rights secured by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"), for breach of contract and for intentional infliction of emotional distress, by the BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL

---

[1] This First Amended Complaint is filed pursuant this Court's Order (Dkt #42) dated March 1, 2018. The Court dismissed the individual defendants and the Fifth and Sixth Causes of Action from this matter pursuant to such Order; however, Plaintiff reserves all rights on appeal.

AND MECHANICAL COLLEGES (the "BOARD"), STATE OF OKLAHOMA, ex rel. OKLAHOMA STATE UNIVERSITY ("OSU," and together with the Board, the "OSU DEFENDANTS"), and ST. MATTHEW'S UNIVERSITY ("SMU") in relation to the wrongs she suffered.

Ms. Guillou tolerated pervasive discrimination and retaliation after she sought medical accommodations while enrolled at OSU's Center for Veterinary Health Sciences ("CVHS") Year IV clinical program. She endured targeted hostility by OSU administration, including Lucinda Kershaw ("Ms. Kershaw"), Dr. Daniel Burba ("Dr. Burba"), Dr. Chris Ross ("Dr. Ross"), and Dr. Margi Gilmour ("Dr. Gilmour"), for speaking openly about her status. Ms. Guillou voiced her complaints about the pervasive hostility both personally and in writing to the Defendants, to no avail. In fact, each time she spoke up, she faced more mistreatment. Accordingly, she now petitions this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of her rights, as well as damages for breach of contract and intentional infliction of emotional distress pursuant to Oklahoma common law.

## PARTIES

1.      Plaintiff, ALEXANDRA GUILLOU, is a citizen of Oklahoma. At all times relevant herein, Ms. Guillou was a qualified student in good standing at OSU's CVHS Year IV clinical program in Stillwater, Oklahoma.

2.      Defendant, STATE OF OKLAHOMA, *ex rel.* OKLAHOMA STATE UNIVERSITY, has its principal place of business in Oklahoma. Defendant, BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL

COLLEGES, supervises, manages, and controls OSU.  The Board establishes all general policies affecting OSU and prescribes rules and regulations as may bring these policies into effect.  The Board delegates executive power to the presidents of the institutions and their authorized administrators, retains approval power over decisions made thereto.  OSU Defendants operate the CVHS Year IV clinical program in Stillwater, Oklahoma.

3.      Defendant, ST. MATTHEW'S UNIVERSITY, has an affiliation agreement in place with the OSU CVHS clinical program, whereby SMU students become vested with certain rights and responsibilities imparted to all OSU students upon matriculation to the CVHS Year IV clinical program.  SMU also remains liable for SMU students, as the contractual relationship between SMU and OSU's CVHS Year IV students remains intact during their affiliate rotations.

4.      At all times relevant hereto, and in all the actions described herein, Defendants' actions took place in the State of Oklahoma, County of Payne unless otherwise noted.

5.      Defendants did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

## JURISDICTION

6.      This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), as there exist claims based upon 42 U.S.C. §§ 12101-12213 and 29 U.S.C. § 701, *et seq*.

7.      Supplemental jurisdiction over Plaintiff's pendant state law claims are proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as her federal claims.

8.      Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as Defendants are located in this District or have significant contacts to this District, and all of the events giving rise to Plaintiff's claims occurred therein.

9.      All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or otherwise waived.

## GENERAL FACTUAL ALLEGATIONS

10.      Ms. Guillou matriculated to SMU in 2011 and attended the veterinary program at SMU's Cayman Islands campus while she completed the classroom courses necessary to advance to Year IV status.

11.      Following completion of her classroom courses, Ms. Guillou was enrolled in clinical rotations at veterinary medical facilities in the United States, including affiliate sites in Illinois and Oklahoma.

12.      In the fall 2016, Ms. Guillou was set to begin rotations at SMU's affiliate school, OSU in the CVHS Year IV program.

13.      As an affiliate student, Ms. Guillou became vested with certain rights and responsibilities imparted to all OSU students, pursuant to OSU's Guidelines for Year III and IV Students Veterinary Teaching Hospital (the "Guidelines"), as she is "enrolled on a semester by semester basis" and is responsible to "follow campus policies and procedures." *Guidelines*, at page 5.

4

14.     Soon after moving to Stillwater, Oklahoma, to complete rotations with OSU's CVHS Year IV clinical program, Ms. Guillou encountered medical problems that required more care than local Stillwater medical facilities could provide.  She immediately contacted both SMU and OSU CVHS to secure a documented medical leave of absence from September 15, 2016, through October 16, 2016, so she could receive regular treatment in Oklahoma City.  She also notified SMU about her medical condition through Chancellor John Marvin, located at SMU's Florida offices.

15.     Ms. Guillou's first medical leave was not processed directly through disability services but was instead facilitated by veterinary faculty Dr. Burba, and administrative associate and affiliate liaison, Ms. Kershaw.  The OSU administrators demanded a meeting to discuss Ms. Guillou's request, where she was forced to share private medical information directly with the academic department and made her uncomfortable.

16.     The tone of the required meeting was more adversarial than helpful, and Ms. Guillou felt like it was an interrogation, as Dr. Burba and Ms. Kershaw harshly questioned her.  They told her, "We typically don't have students do this!" and further, Ms. Kershaw said, "We talked to St. Matthews about you."  At one point, Dr. Burba even told Ms. Guillou that he was "appalled" that Ms. Guillou asked what Mrs. Kershaw discussed with SMU.

17.     Ms. Guillou offered medical documentation to support her leave request, but Dr. Burba and Ms. Kershaw were not interested.  Despite her obvious need for accommodations and her request for leave, Dr. Burba and Ms. Kershaw did not direct Ms.

Guillou to Student Disability Services, who would have been more familiar with the process and would have kept Ms. Guillou's medical information appropriately private.

18.     Ms. Guillou's liaison at SMU was not properly apprised of the meeting with Ms. Kershaw and Dr. Burba; rather than conveying her documented medical need, the OSU Defendants told SMU's Dr. Greg BeVier that Ms. Guillou was "having family issues." This caused additional delay and paperwork with SMU to get the leave approved and diminished the seriousness of Ms. Guillou's problems.

19.     Upon finding out about Ms. Guillou's actual disability requests, SMU similarly failed to direct Ms. Guillou to appropriate SMU or OSU disability services or otherwise verify her needs were being met.  In fact, as alleged above, Ms. Guillou spoke to SMU Chancellor John Marvin, directly, to no avail.  And according to Mrs. Kershaw, OSU allegedly also spoke to a liaison at SMU prior to meeting with Ms. Guillou.

20.     Ms. Guillou's request was processed directly through the OSU CVHS academic department and eventually approved; her leave was granted by OSU, but not through student services as was appropriate.

21.     On October 5, 2016, Ms. Kershaw contacted Ms. Guillou to demand that she immediately return from her medical treatment out of town to turn in her badge and keys, as Ms. Guillou's request to turn the badge and keys in a few days later when she would return from treatment interfered with Ms. Kershaw's "deadlines and responsibilities."

22.     Several days later, Ms. Kershaw contacted Ms. Guillou via voicemail again reminding her to return her radiology keys.  After leaving a brief, polite message that stated

Ms. Guillou's full name, Ms. Kershaw failed to end the call resulting in an inadvertent recording of the OSU Defendants' staff office conversation.

23.     In the recording, an unidentified man can be heard asking, "Aren't you tired of babysitting?"

24.     A voice sounding like Ms. Kershaw replied that "Ali Guillou" is "worse than a child," "you'd think she is, like, five years old or something," that she is "tired of babysitting so much," and that Ms. Guillou "doesn't listen, is not responsible, she lied," which generated audible laughter.

25.     A presumably different voice then asked, "Well, can't we get rid of her?" to which Ms. Kershaw exuberantly replied, "Yeah, yeah!"  Ms. Kershaw then continued to discuss both Ms. Guillou's medical situation and whereabouts for treatment commenting, "Where the hell are you staying there? - well, anyway."  Throughout, Ms. Kershaw spoke with open disdain for Ms. Guillou's medical disability and the negative effect Ms. Kershaw perceived it had on her job.

26.     Then, amidst more laughter, Ms. Kershaw mockingly spoke in a different voice, ostensibly "pretending" to be Ms. Guillou giving some allegedly inadequate response, ending with her own comment, "Do you think that ever happened?  NAH!" to group laughter.

27.     Immediately upon hearing the conversation in her voicemail, Ms. Guillou felt violated, unsafe, and discriminated against because of her need to seek medical treatment.  She also was not clear what "get rid of" meant and cannot be certain the threat was just related to academics and not her overall physical safety.

28.     She reached out to Dr. Margi Gilmour, Interim Associate Dean, to relay her concerns and stress that she felt discriminated against.  Dr. Gilmour attempted to dismiss Ms. Guillou's concerns entirely claiming that no private information was discussed and, regardless, no one heard the conversation who did not already know Ms. Guillou's medical situation.  She claimed only OSU CVHS staff was in the public office, but she offered no evidence to support her claim.

29.     The OSU CVHS office where Ms. Kershaw is seated is publicly accessible, where students, faculty, and the general OSU population can easily enter.  Any students and faculty in the vicinity heard the demeaning comments and the identity of the student who was being mocked and threatened, called a "baby," and a liar.

30.     In this and immediately subsequent meetings, Dr. Gilmour repeatedly tried to casually trivialize Ms. Guillou's concerns about Ms. Kershaw's comments.  When that did not work, Dr. Gilmour threatened Ms. Guillou by saying, "You are really going to cause a problem for yourself if you decide to do something," and further warned her, "The veterinary field isn't that big . . . ."

31.     Ms. Guillou and her mother contacted OSU to discuss how unsafe Ms. Guillou was feeling in light of the disturbing situation and communications by OSU administrators.  In fact, Ms. Guillou spoke early on to an OSU Ombudsman who made her sign a confidentiality paper at the meeting.  He also plainly said, multiple times, "If you were white, this would never have happened," and "If you were white, this would have been corrected already."

32.     On October 14, 2016, Ms. Guillou met with Dr. Tanya Lowery and Dr. Rosalynd Green at OSU's Office of Equal Opportunity ("OEO"), who listened to the voicemail and verbally agreed the recording was proof that Ms. Kershaw violated FERPA and HIPPA, constituted discrimination against Ms. Guillou based on her medical condition, and was a threat to kick her out of the CVHS program, or worse.  Moreover, the pair discussed how Ms. Guillou should be careful not to act like an "angry black woman." In fact, the term "angry black woman" came up several times in the meeting.

33.     When Ms. Guillou asked to file a complaint, they said they would look into the process.  They plainly told her they were "not familiar with this type of student," referring to the Year IV CVHS program students.

34.     Drs. Lowery and Green finally directed Ms. Guillou to Student Disability Services to determine what additional accommodations Ms. Guillou qualified for based on her illness.

35.     On October 20, 2016, Drs. Lowery and Green requested to meet with Ms. Guillou again, along with Dr. Chris Ross, who was Interim Department Head at the time. At that meeting, Ms. Guillou again asked to file a complaint against Ms. Kershaw.  The team, including Dr. Ross, told her that "it would be handled internally."  They refused let Ms. Guillou file a complaint and further told Ms. Guillou that she would not be "privy" to the investigation, including who said what and who was involved in the recorded discussion.  They also refused to remove Ms. Kershaw from overseeing Ms. Guillou's files claiming Ms. Kershaw's affiliate liaison role was required and integral to the affiliation relationship with SMU, and that Ms. Guillou would have to get past her feelings of

trepidation and anxiety about whether those taking part in the offending conversation would unfairly retaliate against her in subjective evaluations.

36.     At the October 20, 2016 meeting, OSU administrators also admitted to Ms. Guillou that she "didn't get the resources you needed up front."

37.     On or about October 27, 2016, Ms. Guillou communicated with someone from SMU about a health insurance question, and the SMU agent again alluded to Ms. Guillou's "attendance issues" with the OSU clinical program and indicated that Ms. Guillou's academic status was in jeopardy.

Ms. Guillou requested more information about how OSU characterized her request.

38.     Alarmingly, the character of the situation as relayed to Ms. Guillou from SMU misconstrued the events from September and October and cast Ms. Guillou in a negative light.

39.     Ms. Guillou understood the fabricated disclosure to SMU to be proof that Ms. Kershaw may very well be making good on her comment that OSU can indeed find a way to "get rid of her," and Ms. Gilmour's threat that the "veterinary field isn't that big."

40.     In the interim, Ms. Guillou was unable to register at SMU or obtain health insurance.  In prior semesters, Ms. Guillou had been permitted to register upon remitting an initial payment for tuition.  Ms. Guillou was initially told by SMU staff in the Florida office that, like in prior semesters, the payment she made prior to the Fall 2016 semester would be sufficient to allow her to register and obtain health insurance.

41.     However, in October, following OSU's communications to SMU and notice of Ms. Guillou's disability related medical leave of absence, SMU told Ms. Guillou that she could not register or receive health insurance.

42.     SMU's Chancellor John Marvin later instructed Ms. Guillou that, despite her disability related need for a leave of absence, if she did not begin her clinical rotation with OSU, SMU would provide no assistance to Ms. Guillou in completing her clinical rotations after the Fall semester. SMU had previously informed Ms. Guillou that they would not grant a leave of absence for her medical conditions and did not approve her leave during the Fall 2016 semester.

43.     On October 31, 2016, Ms. Guillou sent Dr. Ross an email detailing the misinformation conveyed by OSU to SMU.

44.     On November 11, 2016, OSU administrators Lowery and Green *again* refused to remove Ms. Kershaw from overseeing Ms. Guillou's files and continued to refuse to discipline Ms. Kershaw for retaliating in the October voicemail or the October calls to SMU.  They also still refused to allow Ms. Guillou to file a complaint.

45.     As the affiliate liaison for OSU and SMU students, Ms. Kershaw is the "go to" person for all matters involving contract students.  SMU relies on OSU to provide accurate reports of student progress and situations, communicating as needed to address student needs.  The affiliate relationship and support for that relationship provided by OSU is one of the benefits of the OSU program for contract students.

46.     Ms. Kershaw's animosity toward Ms. Guillou, exhibited through the complaining about the work caused by Ms. Guillou's disability related medical leave and

mocking of Ms. Guillou's medical treatment and needs, negatively impacted the support provided by OSU and communication between OSU and SMU.

47.     On January 11, 2017, OSU claimed someone contacted Ms. Guillou requesting she contact the school, but she didn't respond.  This was untrue.  Neither OSU nor SMU attempted to call her.  Dr. Ross did email, once.  Ms. Guillou was still out on approved medical leave, however, and under no obligation to respond to his email in a specific timeframe.

48.     On January 20, 2017, Ms. Guillou's legal counsel sent correspondence detailing the claims Ms. Guillou could substantiate against OSU and the individual actors and followed up with a second correspondence on February 7, 2017.

49.     On February 7, 2017, OSU locked out Ms. Guillou from the OSU computer system.

50.     On or about February 15, 2017, Dr. Ross contacted Ms. Guillou's mother "looking for" Ms. Guillou.  Ms. Guillou's mother confirmed that Ms. Guillou still resided in Stillwater, Oklahoma, and that Ms. Guillou was well.

51.     On or about February 16, 2017, an employee from OSU's Office of Legal Counsel contacted Stillwater police and demanded authorities go Ms. Guillou's residence, claiming Ms. Guillou's parents and school have not heard from her and were worried.  Police arrived at Ms. Guillou's residence and demanded access.  The report to the police about Ms. Guillou's mother being worried was untrue.

52.     Having the police invade her home was traumatizing, frustrating, and exacerbated Ms. Guillou's medical condition.

53.     Following the unannounced police visit, Ms. Guillou's residential management company began conducting "random apartment checks" and treating Ms. Guillou like a wrongdoer, further exacerbating Ms. Guillou's medical condition.

54.     As a result of the cumulative actions by the Defendants, Ms. Guillou has suffered tremendously, physically, mentally, and emotionally, and her career has been delayed further by Defendants' wrongful acts.

55.     As a result of the threats against her, Ms. Guillou lives in fear for her academic and professional career prospects.  Moreover, she cannot be certain that the threats to "get rid of her" were not meant as broader threats against her overall safety and well-being.

## FIRST CAUSE OF ACTION

### *VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12203(a) and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq.*
### *(RETALIATION)*

**Against the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and State of Oklahoma *ex rel.* Oklahoma State University**

56.     Each of the allegations set forth in paragraphs 1 through 55, inclusive, are hereby incorporated by this reference as if realleged fully herein.

57.     That the ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

chapter."   42 U.S.C.  §  12203(a).   The standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the ADA.

58.    That Ms. Guillou engaged in her protected activity when she specifically and directly gave OSU notice that she needed medical accommodations and a leave of absence for her illness.  She provided a note on September 12, 2016, from her physician as proof of her need for a medical accommodation.  She engaged in subsequent meetings with Dr. Burba and Ms. Kershaw regarding her need for medical accommodation in the days thereafter.

59.    That Ms. Guillou was subjected to several adverse actions directly related to her request for medical accommodation:

   a)    Ms. Guillou was subjected to an adverse action during the aforesaid meetings with Dr. Burba and Ms. Kershaw who treated Ms. Guillou like a criminal and interrogated her about her medical diagnosis instead of simply gathering facts to process her appropriate request.  This was unnecessary and cruel because Dr. Burba and Dr. Kershaw could have simply referred her to the Student Disability Services where OSU administrators are purportedly trained to discuss sensitive medical information.  There is no valid reason the hostile meetings had to occur other than to punish Ms. Guillou for requesting medical accommodation, likely because it was a bother for them to have to deal with.

   b)    Ms. Guillou was subjected to adverse action when, days after she went on medical leave, several people including Ms. Kershaw could be

heard discussing and making fun of her for attending to her medical needs. The discussion included taking gibes against her for traveling for treatment ("Why the hell is she staying there?"), insulting her directly, ("worse than a child," "you'd think she is, like, five years old or something," "doesn't listen, is not responsible"), claiming that she lied ("pretending"), and threatening to "get rid of her."

  c)    Ms. Guillou was subjected to adverse action when OSU mischaracterized her request for medical adjustments to SMU and instead told SMU her leave was due to "family problems." This is insulting, demeaning, and a lie designed to undermine Ms. Guillou's professional reputation and make her look bad, weak, and incompetent to SMU.

60.    That there is a direct a causal connection between Ms. Guillou's requests for medical accommodation and her mistreatment by Defendants. Ms. Guillou would not have been subjected to the hostile meetings if she had not sought an accommodation. Moreover, Ms. Kershaw and others can be heard mocking Ms. Guillou's diagnosis and medical requests, even claiming that she is "pretending" in the recording. Furthermore, Ms. Guillou would not have been threatened with dismissal, but for Ms. Kershaw believing she is "worse than a child" or "like, five years or something." Finally, the lie to SMU was directly in relation to Ms. Guillou's request for medical accommodation.

61.    That Ms. Guillou engaged in a second series of protected activities when she specifically and directly reported to various OSU officials that she considered Ms. Kershaw's insulting and threatening voicemail to be a violation of her rights.

62.    That Ms. Guillou was subjected to several adverse actions directly related to her reports of mistreatment:

a)    Dr. Gilmour threatened Ms. Guillou saying, "You are really going to cause a problem for yourself if you decide to do something," and warned her, "the veterinary field isn't that big . . . ."

b)    OSU reported to SMU that Ms. Guillou had "issues" with the OSU clinical program, instead of professionally and accurately conveying information concerning Ms. Guillou's request for medical accommodation.  This led to SMU questioning Ms. Guillou and treating her harshly.

63.    That there is a direct a causal connection between Ms. Guillou's discrimination reports and her mistreatment, given that the events happened closely together and the threats and harsh treatment happened during conversations about her reports.

64.     That Ms. Guillou engaged in a third series of protected activities when, through her counsel, she sent letters to OSU's legal department on January 20, 2017, and February 7, 2017, detailing her mistreatment by OSU.

65.    That Ms. Guillou was subjected to several adverse actions directly related to her third attempt to obtain redress for her mistreatment by OSU:

a)    OSU called her mother, ostensibly to "check up" on her because they were concerned.  This was distressing to both her mother and Ms. Guillou.

b)      OSU summoned the police and falsely reported that Ms. Guillou's

family was concerned, which resulted in the police unexpectedly showing

up and demanding access to her residence.

66.     That there is a direct causal connection between Ms. Guillou's legal

correspondence to OSU and her mistreatment, as OSU called both the police and her

mother within a week of receiving correspondence from her counsel.

67.     The OSU Defendants wrongly retaliated against Ms. Guillou, all in violation

of her rights pursuant to the ADA and the RA, inflicting mental and emotional distress, and

resulting in mental and physical post-traumatic distress and causing further damage to her

health, well-being, academic and professional careers, because she is disabled.

68.     As a direct and proximate result of the unlawful retaliation against Ms.

Guillou in violation of the ADA and the RA by the OSU Defendants, Ms. Guillou has

suffered and continues to suffer damages academically, financially, and emotionally in an

amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

69.     It has been necessary for Ms. Guillou to obtain the services of an attorney to

prosecute this action, and Ms. Guillou is entitled to an award of attorney's fees and costs

of suit incurred herein.

70.     Ms. Guillou is entitled to injunctive and declaratory relief to obtain

readmission to OSU's CVHS program free from retaliation, and for an order forbidding all

Defendants from further perpetuating negative acts against her professionally, personally,

academically, and from committing any other acts of retaliation.

## SECOND CAUSE OF ACTION

### *VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, et seq., and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq.* (*DISABILITY DISCRIMINATION*)

**Against the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and State of Oklahoma *ex rel.* Oklahoma State University**

71.     Each of the allegations set forth in paragraphs 1 through 70, inclusive, are hereby incorporated by this reference as if realleged fully herein.

72.     That Title II of the ADA provides, "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The RA provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."  29 U.S.C. § 794(a).  Because the language of these two provisions is substantially similar, claims under both acts are generally analyzed together.

73.     That OSU is subject to the mandate of the ADA and receives federal financial assistance ("FFA"), as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of her disabilities.

74.     That Ms. Guillou is a "qualified individual with a disability."  Ms. Guillou suffers from ADD, PTSD, Severe Depression, and an anxiety disorder, which are qualifying disabilities.  These disabling conditions substantially limit major life activities;

including, learning and working, because they substantially limit her ability to leave the house without debilitating attacks, require her to take medications, and require her to seek extensive medical treatment, which adversely affected her ability to attend classes, thereby affecting her ability to function in her role as a student at OSU.  She is otherwise able to perform the essential functions for participation in OSU's curriculum with or without accommodations.

75.     That the OSU Defendants discriminated against Ms. Guillou on the basis of her disability when Ms. Guillou requested medical accommodation and Defendants took the following actions against her:

a)      Singling out Ms. Guillou by name and saying she was "worse than a five year old," "like a child," that she "lied" and "pretended" to have a medical condition.  These comments were made in an open area where passersby, instructors and other OSU students likely heard and judged her too.  There is no evidence that Ms. Kershaw and other CVHS officemates spoke disparagingly about all veterinary students and threatened to "get rid" of each one accordingly.  Ms. Kershaw did so to Ms. Guillou because she has a disability and had sought a medical leave that created work for and inconvenienced Ms. Kershaw.

b)      Threatening to "get rid of her" and telling Ms. Guillou she was "really going to cause a problem for yourself if you decide to do something" because the veterinary field isn't that big."  Again, there is no

evidence that Defendants similarly threatened all veterinary students. Defendants did so to Ms. Guillou because she has a disability.

c)      Repeatedly misstating and conveying false information about Ms. Guillou to SMU.  It is highly unlikely that Ms. Kershaw, OSU's affiliate liaison, misstates and conveys false information about *all* affiliate students to their home schools or further makes up false "family problems" and disparagingly talks about their "issues" in regards to non-disabled students.  If she did, she likely would not have such an important job.  Defendants repeatedly misstated and conveyed false information about Ms. Guillou because she has a disability.

d)      Calling Ms. Guillou's parents and then the police for no justifiable reason other than to harass her.  Defendants cannot be in the habit of routinely calling the police when each of their 25,000 students simply does not immediately return a call, especially after verifying with family that the student is safe.  Defendants did so to Ms. Guillou because she has a disability.

e)      Depriving Ms. Guillou of the same level of benefits and services the OSU program offered to non-disabled students, including affiliate program support and accurate communication and reports of progress to SMU.

f)      Locking her out of OSU's computer system while she remained on medical leave.

g)    Any and all other additional wrongful acts perpetuated against Ms. Guillou by Defendants, as described herein, or otherwise perpetuated to SMU, faculty, those in the "veterinary field," or others that Ms. Guillou has not yet discovered, but already occurred in actuating Ms. Kershaw's and Dr. Gilmour's threats.

76.    That, in fact, Dr. Ross admitted that Ms. Guillou had been singled out by Defendants, as "there are simply too many students for Ms. Kershaw to target every single one."   Other OSU CVHS students did not face similar inappropriate behavior or mistreatment, and none of the Defendants ever alleged Ms. Guillou's treatment stemmed from the fact that she did not satisfy the CVHS academic or technical standards, that she was not qualified to be in the program, or any other legitimate reason.   Ms. Guillou was targeted solely because she has a disability.

77.    The OSU Defendants wrongly discriminated against Ms. Guillou, all in violation of her rights pursuant to the ADA and the RA, inflicting mental and emotional distress, and resulting in mental and physical post-traumatic distress and causing further damage to her health, well-being, academic and professional careers, because she is disabled.

78.    As a direct and proximate result of the unlawful discrimination against Ms. Guillou in violation of the ADA and the RA by the OSU Defendants, Ms. Guillou has suffered and continues to suffer damages academically, financially, and emotionally in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

79.     It has been necessary for Ms. Guillou to obtain the services of an attorney to prosecute this action, and Ms. Guillou is entitled to an award of attorney's fees and costs of suit incurred herein.

80.     Ms. Guillou is entitled to injunctive and declaratory relief to obtain readmission to OSU's CVHS program free from retaliation, and for an order forbidding all Defendants from further perpetuating negative acts against her professionally, personally, academically, and from committing any other acts of discrimination.

## THIRD CAUSE OF ACTION

### *VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, et seq.*
### *(DISABILITY DISCRIMINATION AND HARASSMENT)*

### Against St. Matthew's University

81.     Each of the allegations set forth in paragraphs 1 through 80, inclusive, are hereby incorporated by this reference as if realleged fully herein.

82.     That Ms. Guillou is a student with a disability.  Ms. Guillou suffers from ADD, PTSD, Severe Depression, and an anxiety disorder, which are qualifying disabilities. These disabling conditions substantially limit major life activities; including, learning and working, because they substantially limit her ability to leave the house without debilitating attacks, require her to take medications, and require her to seek extensive medical treatment, which adversely affected her ability to attend classes, thereby affecting her ability to function in her role as a student at OSU.

83.     That SMU's administrative offices, which manage admissions, enrollment, financial aid, billing, health insurance and coordination of students in clinical placements,

are located in Orlando, Florida and relevant decisions made by SMU occurred in the Florida office.

84.     That SMU operates at least one online joint degree program with a U.S. university that enables students enrolled in and located at SMU to simultaneously attend another program and obtain federal student loans and financial aid.  Students may then utilize these federal funds for living and other expenses while at SMU.  SMU owns and operates student housing for which it charges its students.

85.     That SMU is subject to the mandate of the ADA as an institution of public accommodation and receives federal financial assistance ("FFA"), as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of her disabilities.

86.     That SMU has a continuing responsibility for SMU students enrolled at affiliate institutions and as part of its program arranges for and requires student support, scheduling and communication of progress and concerns by the affiliate institution.  SMU also provides students at affiliate institutions with oversight by U.S. based SMU staff. These services and supports are benefits of SMU's program.

87.     That Ms. Guillou endured targeted hostility by OSU while she was enrolled as an SMU affiliate student at OSU's CVHS Year IV program.

88.     That the harassment Ms. Guillou faced was severe enough to alter the course of her education and create an abusive educational environment.  Ms. Guillou faced multiple threats and OSU administrators have acted on those threats by providing inaccurate updates concerning Ms. Guillou and by calling the police on Ms. Guillou under false pretenses.  This has exacerbated Ms. Guillou's underlying condition, necessitating

she take additional time off to cope and recuperate.  Furthermore, Ms. Guillou undergoes tremendous stress whenever she is required to talk to Ms. Kershaw or other CVHS office administrators, and such communication is a non-negotiable necessity to her continued enrollment.  Since the incidents described herein, Ms. Guillou also tried to limit time in the administration building to avoid further damaging stress.   Finally, she is perpetually worried that other students, faculty, or general public also listened to Ms. Kershaw and others discuss her private information, and she is fearful that prejudices caused therefrom will jeopardize others' ability to judge her based on her merits and not her condition.

89.    That SMU knew about Defendants' campaign of harassment against Ms. Guillou, as Ms. Guillou herself had to explain the falsehoods OSU told SMU in an attempt to discredit Ms. Guillou and get her dismissed from the CVHS Year IV program.

90.    That despite knowing about Ms. Guillou's issues with OSU, SMU has failed to do anything to alleviate her distress and has not acted to prevent OSU from continuing to harass her, retaliate against her, or discriminate against her.

91.    The OSU Defendants wrongly discriminated against Ms. Guillou, all in violation of her rights pursuant to the ADA and the RA, inflicting mental and emotional distress, and resulting in mental and physical post-traumatic distress and causing further damage to her health, well-being, academic and professional careers.   SMU was deliberately indifferent to Ms. Guillou's harassment by Defendants, all in violation of her rights pursuant to the ADA and RA, inflicting mental and emotional distress, resulting in mental and physical post-traumatic distress, and causing further damage to her health, well-being, academic and professional career, because she is disabled.

92.     That SMU failed to provide Ms. Guillou with the benefits and services offered to non-disabled students, including affiliate support and SMU oversight, because her difficulties with OSU arose from her disability and OSU failed to provide non-discriminatory affiliate support.

93.     As a direct and proximate result of SMU's deliberate indifference to the harassment of Ms. Guillou in violation of the ADA and the RA by Defendants and SMU's discrimination, Ms. Guillou has suffered and continues to suffer damages academically, financially, and emotionally in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

94.     It has been necessary for Ms. Guillou to obtain the services of an attorney to prosecute this action, and Ms. Guillou is entitled to an award of attorney's fees and costs of suit incurred herein.

95.     Ms. Guillou is entitled to injunctive and declaratory relief to obtain readmission to OSU's CVHS program free from retaliation, and for an order forbidding all Defendants from further perpetuating negative acts against her professionally, personally, academically, and from committing any other acts of discrimination.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

**Against the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, State of Oklahoma *ex rel.* Oklahoma State University, and St. Matthew's University**

96.     Each of the allegations set forth in paragraphs 1 through 95, inclusive, are hereby incorporated by this reference as if realleged fully herein.

97.     That courts in Oklahoma and the Tenth Circuit impose a contract on the relationship between students and universities.  Materials actually provided to students may become part of the agreement.

98.     That Ms. Guillou had a contract with the OSU Defendants in connection with rights explicitly guaranteed by the Guidelines pursuant to her entrance into the OSU CVHS Year IV program.

99.     That Ms. Guillou had a contract with SMU pursuant to her enrollment in the Veterinary school.  Some of the terms of that contract are found in the SMU Official Catalog ("SMU Catalog") and in application forms provided by SMU when she applied and was accepted.

100.    That Ms. Guillou dutifully complied with the mandates of the contractual materials governing her relationship with the OSU Defendants and SMU.

101.    That, in contrast, SMU failed to comply with its promise that, "No person shall be excluded from participation in, denied benefits of, or be subject to discrimination under any program or activity sponsored or conducted by St. Matthew's University, on any basis prohibited by applicable law, including, but not limited to, race, color, national origin, sex, age, or handicap."   SMU discriminated against and permitted its affiliate school to discriminate against Ms. Guillou on the basis of her disability, which was in violation of the applicable laws in the state of Oklahoma and in the United States, and thus in violation of SMU's contract with Ms. Guillou.

102.    That the OSU Defendants failed to comply with OSU Guidelines, which specifically forbid discrimination on the basis of disability.  The Guidelines refer to the

OSU policy, which states, in relevant part, "It is the policy of Oklahoma State University to provide equal opportunity on the basis of merit without discrimination because of age, race, ethnicity, color, sex, religion, national origin, sexual orientation, veterans' status, or disability," https://eeo.okstate.edu/harassment-and-discrimination, and further states:

> Oklahoma State University will not tolerate discrimination against any student because of gender, race, age, sexual orientation, status as a veteran, national origin, religion, or disability. Oklahoma State University embraces and commits itself and its faculty and staff employees to follow provisions of state and federal law prohibiting discrimination against persons with disabilities, including, but not limited to, the Americans with Disabilities Act and the Rehabilitation Act of 1973. *OSU Policy 2-0824*.

103. The OSU Defendants discriminated against Ms. Guillou on the basis of her disability and in violation of these contractual promises when they took the following actions against her:

a)  Singling out Ms. Guillou by name and saying she was "worse than a five year old," "like a child," that she "lied" and "pretended" to have a medical condition. These comments were made in an open area where passersby, instructors and other OSU students likely heard and judged her too. There is no evidence that Ms. Kershaw and other CVHS officemates spoke disparagingly about all veterinary students and threatened to "get rid" of each one accordingly. Defendants did so to Ms. Guillou because she has a disability.

b)  Threatening to "get rid of her" and telling Ms. Guillou she was "really going to cause a problem for yourself if you decide to do

something" because the veterinary field isn't that big." Again, there is no evidence that Defendants similarly threatened all veterinary students. Defendants did so to Ms. Guillou because she has a disability.

c)    Repeatedly misstating and conveying false information about Ms. Guillou to SMU. It is highly unlikely that Ms. Kershaw, OSU's affiliate liaison, misstates and conveys false information about *all* affiliate students to their home schools or further makes up false "family problems" and disparagingly talks about their "issues" in regards to non-disabled students. If she did, she likely would not have such an important job. Defendants repeatedly misstated and conveyed false information about Ms. Guillou because she has a disability.

d)    Calling Ms. Guillou's parents and then the police for no justifiable reason other than to harass her. Defendants cannot be in the habit of routinely calling the police when each of their 25,000 students simply does not immediately return a call, especially after verifying with family that the student is safe. Defendants did so to Ms. Guillou because she has a disability.

e)    Any and all other additional wrongful acts perpetuated against Ms. Guillou by Defendants, as described herein, or otherwise perpetuated to SMU, faculty, those in the "veterinary field," or others that Ms. Guillou has not yet discovered, but already occurred in actuating Ms. Kershaw's and Ms. Gilmour's threats.

104.   That SMU has discriminated against Ms. Guillou by failing to provide her with the benefits and services offered to non-disabled students, including affiliate support and SMU oversight, because her difficulties with OSU arose from her disability and OSU failed to provide non-discriminatory affiliate support.

105.   As a direct and proximate result of Defendants' unlawful breaches, Ms. Guillou has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

106.   It has been necessary for Ms. Guillou to obtain the services of an attorney to prosecute this action, and Ms. Guillou is entitled to an award of attorney's fees and costs of suit incurred herein.

107.   Ms. Guillou is entitled to injunctive and declaratory relief to obtain readmission to OSU's CVHS program free from the Defendants' breaches of their respective contracts, and for an order forbidding all Defendants from further perpetuating any subsequent breach.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief as follows:

1.  For general and compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

2.  For punitive damages against the Individual Defendants in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

3.  For injunctive and declaratory relief described herein, as the Court deems appropriate;

4.  For pre-judgment and post-judgment interest, as provided by law;

5.  For the costs and disbursements of this action, including experts, and such other attorneys' fees, pursuant to 42 U.S.C. § 1988; and

///

///

6.   Such other and further legal and equitable relief as this Court

deems necessary, just and proper.

Dated this 15th day of March, 2018.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

   */s/ Jason J. Bach*

Jason J. Bach, Esq.
(Admitted *Pro Hac Vice*)
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com

and

**GRAHAM &FREEMAN, PLLC**
R. Jack Freeman, OBA #3128
6226 East 101st Street, Suite 300
Tulsa, Oklahoma 74137-7117
Telephone: (918) 298-1716
Facsimile: (918) 298-1728
Email: jfreeman@grahamfreeman.com

*Attorneys for Plaintiff Alexandra Guillou*